IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JEANENE K. BASYE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 06-6171-JO |
| | ) | |
| v. | ) | <u>OPINION AND ORDER</u> |
| | ) | |
| COMMISSIONER, SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

Richard F. McGinty
McGINTY & BELCHER, PC
P.O. Box 12806
Salem, OR 97309

  Attorney for Plaintiff

David M. Blume
SOCIAL SECURITY ADMINISTRATION
701 Fifth Avenue
Suite 2900 M/S 901
Seattle, WA 98104-7075

Neil J. Evans
UNITED STATES ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97201

Attorneys for Defendant

JONES, Judge:

## INTRODUCTION

Claimant Jeanene Kaye Basye seeks judicial review of a final decision of the

Commissioner of Social Security denying her application for Disability Insurance Benefits

("DIB") and Supplemental Security Income payments ("SSI").  *See* 42 U.S.C. §§ 401-33.  This

court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

After an exhaustive review of the record, I find that the Commissioner's decision that the

claimant is not disabled is supported by substantial evidence and does not contain errors of law,

and thus must be affirmed.

## ADMINISTRATIVE HISTORY

On November 27, 2001, claimant filed applications for DIB and SSI, alleging inability to

work since May 27, 2001.  Both claims were denied initially and on reconsideration.  Claimant

requested a hearing before an Administrative Law Judge ("ALJ").  The ALJ held a hearing

January 5, 2004.  Claimant, represented by counsel, testified, as did an impartial vocational

expert ("VE").  The ALJ issued a decision denying claimant's applications on February 18, 2004.

The ALJ's decision became the final decision of the Commissioner on July 3, 2006, when the

Appeals Council denied claimant's request for review of the ALJ's decision.

2 - OPINION AND ORDER

STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is supported by substantial evidence and the correct legal standards were applied. Baston v. Comm'r of Soc. Sec., 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence is defined as being such relevant evidence as to lead a reasonable mind to support a conclusion; it may be less than a preponderance, but more than a mere scintilla. Connett v. Barnhart, 340 F.3d 870, 871 (9th Cir. 2003); Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993). Under this standard, the Commissioner's findings must be upheld if supported by inferences reasonably drawn from the record. Gallant v. Heckler, 753 F.2d 1450, 1452-53 (9th Cir. 1984). The ALJ is responsible for determining credibility, settling conflicts in the medical evidence and resolving ambiguities. Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence supports more than one rational interpretation, the court must defer to the Commissioner's decision. Morgan v. Commissioner, 169 F.3d 595, 599 (9th Cir. 1999). The Commissioner's decision will not be reversed for errors that are harmless. Stout v. Comm'r of Soc. Sec., 454 F.3d 1050, 1054 (9th Cir. 2006).

SUMMARY OF THE ALJ'S FINDINGS

The ALJ followed the required five-step sequential evaluation in determining whether claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof to establish steps one through four, and the burden shifts to the Commissioner at step five. *See* id.

At the first step, the ALJ found that claimant had not engaged in substantial gainful work activity since her alleged onset date of May 27, 2001. Tr. 16. Second, the ALJ found that claimant suffered from the following severe impairments: back pain, fibromyalgia, diabetes,

possible seizures, depressive disorder, anxiety disorder, and substance addiction disorder.  Id.

At the third step, the ALJ found that claimant's impairments did not meet or substantially equal

the requirements of a listed impairment in 20 C.F.R. part 404, subpart P, app. 1.  Tr. 16-17.

These findings are not in dispute.  At step four the ALJ found that claimant could not perform

her past relevant work, but based on the testimony of the VE, the ALJ found that claimant is able

to perform substantial gainful activity in a significant number of other jobs that exist in the

national economy, including folding laundry or assembling small products or electronics.  Tr. 31.

The ALJ determined that claimant's Residual Functional Capacity ("RFC") permitted her to

perform light exertion work, including simple 1-2-3 step jobs and occasional interaction with

coworkers and the public.  Id.  In making that determination, the ALJ found that the claimant's

assertions concerning her ability to work were lacking in credibility.  Tr. 24-26.  Accordingly,

the ALJ found that claimant was not disabled as defined by the Social Security Act, and denied

her applications for benefits.  Tr. 32.

## STATEMENT OF FACTS

Claimant was born August 1, 1956, and was 47 years old at the time of the hearing.

Tr. 63.  She has a high school education with one year of vocational computer training.  Tr. 379.

Her past work experience includes employment as a fast food worker, a sales attendant, a file

clerk, a cook, a waitress, and a day care provider.  Tr. 81.  The last relevant employment

claimant had was at Jack in the Box from October 1999 until May 2001.  Tr. 102.

Claimant lives with her sister and father in an apartment.  Tr. 112.  Her daily activities

include preparing her own meals, watching three to four hours of television, doing needlepoint

for at least two hours a day, riding the bus, and talking on the phone to friends and relatives.

4 - OPINION AND ORDER

Tr. 99-100, 113.  On a weekly basis, she does the grocery shopping, visits friends and relatives, uses the internet, and donates plasma.  Tr. 99, 113, 117.  She cares for her granddaughter a few days a week.  Tr. 396.  During the summertime, she swims at the local pool with her granddaughter and friends.  Tr. 397.  For exercise, she walks daily, but must stop and rest after approximately one and a half blocks.  Tr. 116.  Claimant has friends and socializes occasionally.  Tr. 113-14.  Her conversations with friends and family are normal, although she is sensitive and takes offense easily.  Id.  Her daily medication includes Effexor, Respiritol, Anitripoline, Naproxen, and Melhocarbon, which cause her a great deal of drowsiness as well as dry mouth.  Tr. 95.  Additional relevant facts regarding her medical history are discussed below.

## SUMMARY OF MEDICAL EVIDENCE

As shown by the record, claimant has suffered from a number of physical and psychological ailments for the majority of her lifetime.  It is evident that her physical symptoms have influenced her psychological state.  It is also evident that her psychological problems have, to a greater or lesser degree, influenced and aggravated her physical symptoms.  Interestingly, the record contains extensive medical and psychological reports that predate claimant's alleged period of disability, showing roughly the same kind and severity of problems she experienced during the relevant period, but taking place while she maintained employment.  The principal medical evidence that formed the ALJ's opinion is as follows.

1.      Physical Symptoms

      A.      Back Pain

Claimant visited the emergency room December 5, 2001, May 6 and 31, 2002, and October 2, 2003 for back pain.  Tr. 174-75, 187.  On December 5, 2001, claimant went to the

5 - OPINION AND ORDER

emergency room for back pain not due to any strain or injury.  Tr. 187.  She requested Skelaxin, but the nurse prescribed Flexeril instead due to Skelaxin's unavailability, and instructed claimant to do back exercises and apply heat.  Id.  On May 6, 2002, claimant complained of pain in her low back and some leg pain with straight leg raising.  Tr. 175.  She had full strength on dorsiflexion and plantar flexion, but complained of pain with axial loading and with positive side-twisting.  Id.  The nurse prescribed Robaxin and recommended an MRI.  Id.  A CT scan performed May 19 showed an unremarkable cervical spine with no significant abnormalities. Tr. 176.  Alignment was normal, as were her prevertebral soft tissues.  On the follow-up visit on May 31, 2002, claimant stated that her back pain was better, but that she lost all sensation in her legs whenever she walked or exercised, and the only thing that made the sensation come back was lying on her back or side for four hours or more.  Tr. 175.  During the exam the nurse noted that there was no apparent pain with straight leg raising but that claimant later stated that she had pain in this position.  Otherwise, she winced and showed apparent pain during each movement of the exam.  The nurse prescribed Naproxen for pain.  Id.

In December 2002, Dr. Lyndon Box, MD examined claimant.  Tr. 213.  Dr. Box noted in his evaluation that claimant had apparent difficulties with bending, stooping, and crouching. Tr. 213,  215.  Other than her reports of pain, however, he was unable to make any objective findings.  Tr. 216.  An x-ray performed two days later on claimant's lumbar spine showed mild osteoarthritis and possible beginning degenerative disc disease, but otherwise an unremarkable lumbar spine.  Tr. 218.

On October 2, 2003, claimant saw Dr. Salvador Ortega for a sudden onset of back pain and loss of strength in her legs, which she claimed began when she was placing an object on a

shelf, lost strength in both legs, and fell down.  Tr. 305.  When the nurse offered samples of

Celebrex to use for the pain, claimant stated that she was unable to use it because of an aspirin

allergy.  Id.  The doctor explained that Celebrex does not contain aspirin, but claimant said that it

was not helping her and would instead continue to use the Vioxx she already had at home.  Id.

      B.     <u>Fibromyalgia</u>

Claimant takes pain medication to treat her symptoms of fibromyalgia, but does not

participate in any other type of treatment, such as physical therapy, trigger point injections,

cognitive behavioral therapy, or other measures.  She stated in the Claimant Pain Questionnaire

that her pain is sharp, stinging, burning, and achy, is located all over her entire body, continues

all day and night, and never stops.  Tr. 94.  She also asserts that any type of activity makes the

pain worse and the only thing that helps is lying down.  Id.

Although the record does not contain a direct report of a previous diagnosis of

fibromyalgia, claimant continuously asserts that she was diagnosed with it in the past.  On

December 21, 2002, claimant informed Dr. Box that she was diagnosed in 1993 with

fibromyalgia, but that same day, during an examination performed by Dr. Paul Brown, Ph.D,

claimant stated that she had been diagnosed in 1996.  Tr. 213, 219.  There is no current objective

test in place for a diagnosis of fibromyalgia; diagnosis generally is based on reported symptoms

and an 18-point test in which pressure is applied to 18 points on the patient's body, and a positive

result on 11/18 supports a diagnosis.  6 <u>Attorneys' Textbook of Medicine</u> § 25.30 (3d ed. 2007).

Dr. Box performed the 18-point test on claimant during his December 2002 examination, and she

came up positive on all points.  Tr. 216.  His diagnosis of fibromyalgia, he cautioned in his

report, "must be qualified by tenderness in other areas as well" and "by the fact that I feel she

has severe somatization and possible attempt at secondary gain." Id.  He further states that "it is highly unlikely that she had pain and limitation to the extent demonstrated during my examination due to the fact that it would make it impossible to have ambulated into my examination room" Id.

C.    Diabetes

Medical progress notes in the record show that claimant's diabetes generally is under control, and in the few instances in which it was noted that her diabetes was under inadequate control, the progress notes show that the reason was her non-compliance with the management of the disease.  Tr. 304, 308, 310, 316, 319.  Indeed, at the hearing the ALJ asked claimant if, other than eating at certain times, the diabetes affected her ability to work.  Claimant responded that, unless she forgot to take her insulin, it did not.  Tr. 388.

D.    Epilepsy

Claimant testified that she had been diagnosed with epilepsy in 2003, of which there is no record.  Tr. 388-89.  In a medical report dated February 2, 2003, a nurse noted that claimant complained of "blanking out" episodes, occurring since childhood and lasting 15-20 minutes at a time, in which claimant "thought she was daydreaming."  Tr. 317.  Claimant reported the same symptoms on February 20 and March 20, 2003.  Tr. 318-19.  Id.  A pre- and post-contrast cranial CT scam was performed March 21, 2003, showing sinus disease but otherwise normal results. Tr. 325.  An EEG was scheduled to take place March 25, 2003, of which there is no record.  On July 14, 2003, a brain MRI was performed with negative results other than a showing of paranasal sinus disease.  Tr. 324.  During the hearing, claimant told the ALJ that her epilepsy was under control by medication.  Tr. 189.

8 - OPINION AND ORDER

E.    <u>Asthma</u>

Claimant's asthma has generally been mild or stable and well-controlled by medication. Tr. 172, 181, 182. She takes Singulair at night and uses an inhaler during the day when necessary. Tr. 181. She testified that it flares up when she does too much walking or too much stair climbing. Tr. 390-91. The record reveals that claimant continues to smoke a half a pack of cigarettes daily. Tr. 396.

F.    <u>Migraines</u>

On October 31 and December 5, 2001 and January 2 and February 8, 2002, claimant visited the emergency room for migraine headaches (as well as multiple times before the alleged period of disability). Tr. 183, 185. On February 8, 2002, claimant stated that she gets migraines twice a week and stress headaches whenever she rode the bus, which was daily, but that two Midrin were usually sufficient to eliminate her headaches. Tr. 183. However, on previous visits the care provider remarked in the notes that claimant asked for "her usual," which was a Demerol/Phenergan combination injection. <u>Id</u>. During a January 2, 2002 visit, claimant demanded a Demerol/Phenergan injection, and when the nurse practitioner explained to her that Demerol was not available, claimant complained and refused to leave the clinic for ten minutes following an injection of ketorolac. Tr. 185.

Claimant testified that her migraine problem has generally resolved itself, and she only gets one per month. Tr. 395-96. She also stated that "the doctor won't give me anything for the pain, so I just lay down and wait for it to go away." Tr. 395. Yet the record shows that claimant has been on multiple pain killers for her headaches and migraines, including Midrin, Naproxen, Demerol, Phenergan, Vicodin and Codeine. Tr. 149, 150, 151, 152, 177, 183, 185.

9 - OPINION AND ORDER

G.      Arthritis

In her disability report, claimant alleges that she has osteoarthritis and gout arthritis. Tr. 80.  Yet in the report of the examination performed by Dr. Box on December 21, 2002, Dr. Box stated that it was "impossible" for claimant to have arthritis as she describes.  Tr. 216. According to Dr. Box, she could not have osteoarthritis or gout arthritis because she did not have any signs of crepitous, and she could not have rheumatoid arthritis because she had no signs of musculoskeletal abnormalities.  Id.  An x-ray taken the same day as Dr. Box's exam showed an essentially unremarkable lumbar spine, with mild osteoarthritis and beginning degenerative disc disease.  Tr. 218.  In contrast, at the hearing claimant testified that her arthritis was prohibitively severe: that the arthritis affected essentially each joint in her body, making it difficult, if not impossible, to bend, squat, lift, climb, twist, handle small things, stand for more than ten minutes, sit for more than thirty minutes, or get up after sitting.  Tr. 381-83.

H.      Gastroesophageal Reflux Disease ("GERD")

Claimant visited the emergency room March 29, 2002, for abdominal pain.  Tr. 178.  The treating nurse advised claimant that her pain was most likely caused by ibuprofen use for pain. Id.  On April 5, she had an endoscopy, which showed moderate to severe GERD, with somewhat prominent esophageal folds but no ulceration or hernia.  Tr. 192.  A UGI performed in July 2002 showed reflux and esophagitis, and Pepcid was prescribed.  Tr. 172.  As claimant continued to have symptoms of reflux and dysphagia, Dr. Michael Buck performed another endoscopy October 30, 2002 which ruled out diagnoses of Barrett's mucosa or stricture.  Tr. 340-41.  The diagnosis was hiatal hernia, and Dr. Buck recommended that claimant continue taking Protonix for her GERD symptoms.  Id.  At the hearing claimant testified that her acid reflux did not affect

her ability to work.  Tr. 390.

        I.      <u>Knee Pain</u>

Claimant went to the emergency room August 9, 2002, complaining of right knee pain.

Tr. 323.  The nurse's notes reflect left knee pain as well, but only her right knee was x-rayed.

The x-ray showed well-maintained joint spaces, normal soft tissues and osseous structures, and

no joint effusion.  <u>Id</u>.  The overall impression was negative right knee.  <u>Id</u>.  During her follow-up

appointment August 21, the nurse's notes indicated that since the x-ray was negative, diagnosis

was unclear, and there was no apparent explanation for claimant's knee pain.  Tr. 322.  She was

given samples of Bextra for her pain. Claimant did not mention her knee pain at the hearing.  <u>Id</u>.

  2.      <u>Psychological Symptoms</u>

The records reflect that claimant has been experiencing symptoms of depression for more

than a decade.  At the hearing, claimant testified that depression affects her ability to work in

that she becomes nervous around crowds of people, has problems concentrating and focusing,

and that her medications (Effexor, Respiritol, and Anitripoline) make her drowsy.  Tr. 393-94.

Ben Newman, a Psychiatric Mental Health Nurse Practitioner at Marion County Adult

Mental Health, gave claimant a comprehensive mental health assessment January 23, 2002.

Tr. 209.  In his report, Newman stated that claimant's thought content was free of obsession,

psychotic ideation, or delusions, and that she was coherent and logical.  Tr. 211.  She had good

associations and was not easily distracted.  <u>Id</u>.  However, she reported hearing voices at age 8,

being molested by an uncle in childhood, and being impulsive and having a hard time

concentrating.  <u>Id</u>.  She did have some suicidal ideation, but was not currently suicidal.  <u>Id</u>.

Newman's report also states that claimant exercises, eats healthily, and enjoys walking, window

11 - OPINION AND ORDER

shopping, bowling, and going out to lunch with friends.  Tr. 210.  Her substance abuse history included the use of marijuana (limited), speed (moderate), benzodiazaphines (limited), alcohol (extensive), and cocaine (one time only).  Id.  She stated that she had problems drinking because she did not know when to stop and that she still craves alcohol, although she had not had a drink since September 2001.  Id.  Newman did not perform any standardized psychological testing on claimant, but nonetheless gave the diagnosis of Major Depressive Disorder, recurrent, severe, with psychotic features, Post-Traumatic Stress Disorder, and Polysubstance Dependence.  Tr. 211.  He assigned a Global Assessment of Functioning score of 25.  Id.

Claimant went back to Marion County Adult Mental Health every two months or so from February 2002 until May 2003 and was seen by Cathy Nichols and Tom Breyer, both Psychiatric Mental Health Nurse Practitioners.  Tr. 200-208, 326-31.  The nurses' reports generally restated claimant's subjective allegations of symptoms and made no changes to Newman's initial diagnosis.  Each report of these visits stated that claimant was generally psychiatrically stable and status quo.  On some occasions, claimant told the nurse that she was doing better, that her pain had improved, or that her depression had lessened.  Tr. 201, 203, 327.  On two occasions claimant complained of feeling bad or worse than usual, and claimant did speak of hearing voices during three visits.  Tr. 200, 201, 208.  No major problems were noted with suicidal thoughts.  The nurses managed her medications, and made no other changes in claimant's therapy.

On December 21, 2002, Dr. Brown, Ph.D examined claimant.  Tr. 219.  Claimant reported that she was depressed, had suicidal thoughts, and was overly critical of herself for being overweight and not working.  Id.  Claimant also reported that she had "a wonderful

growing up" but also reported delusions as a child.  Tr. 220, 222.  She talked of having

prescience, that she knew what people were going to say before they said it.  Id.  She reported

some alcohol problems but said she had "no problems with drugs ever" and that she did not

smoke.  Tr. 221.  She also reported being arrested in 1985 and 1999 for theft, and spent 20 days

in jail in 1999.  Tr. 220.  Overall, Dr. Brown noted that she dealt very well with her pain and was

in a good mood.  Tr. 222.  His diagnosis was "History of suicide and some delusional thinking

that she has had certainly major depression, severe or chronic."  Tr. 223.  He found that her

prognosis was good.  Id.  As far as her physical functional assessment (based on her reports), Dr.

Brown wrote that "unfortunately she cannot perform work activities on a consistent basis or

maintain attendance in the workplace."  Tr. 224.

Dr. Richard Fredrickson, MD, completed a Mental Status Report on December 26, 2002.

Tr. 225.  Dr. Fredrickson stated that claimant had visited once a month since January 23, 2002

(the date of Mr. Newman's report), and that his last exam was November 27, 2002 (no record of

an exam on that date).  Id.  Under "General Observations," he noted that she was "tangential at

times."  Id.  Under "History," he wrote that claimant had suicidal ideation since 1995 x 3 and

was hospitalized twice for psychiatric illness (no record of when these took place).  Id.  Dr.

Fredrickson described claimant's symptomology as depression, anxiety, racing thoughts,

obsessive/compulsive thoughts and behavior and psychotic features.  Id.  The most recent

objective findings were impaired insight and judgment.  Dr. Fredrickson reported no change in

condition since she was first treated; her depressive disorder was chronic, severe, and persistent.

Tr. 226.  Under "Social Functioning," Dr. Fredrickson wrote that claimant was socially isolated

and had "no group activity."  Tr. 226.  He stated that she had marked impairment in

concentration and persistence, no sense of pace, and had no ability to adapt.  Tr. 227.  Stress, Dr. Fredrickson noted, would cause problems with severe impairments that present a bar to employment.  Id.  His diagnostic impression was "Major Depressive Disorder, recurrent, severe, with psychotic features, Post-Traumatic Stress Disorder, and Polysubstance Dependence" (identical to that given initially by Newman).  Tr. 226.

Dr. Frank Lahman, PhD, and Dr. Bill Hennings, PhD conducted reviews of claimant's records and completed psychiatric review technique forms on January 17, 2003, and April 11, 2003, respectively.  Tr. 279.  According to Drs. Hennings and Lahman, claimant's restriction of daily activities and difficulties in maintaining social functioning are "mild," but she has "moderate" difficulties maintaining concentration, persistence, or pace.  Tr. 289.  No episodes of decompensation are noted.  Id.  Therefore, according to this report, the "B" criteria in the Listing of Impairments were not met.  Id.  As far as the "C" criteria, the doctors concluded that the records do not support a finding of "C" criteria.  Tr. 290.

DISCUSSION

Claimant asserts that the ALJ committed errors of law and made a decision that was not based on substantial evidence.  Claimant's four assignments of error may be condensed into two main arguments: that the ALJ used improper standards in evaluating the opinions of the medical sources, and that the ALJ rendered his own medical opinion instead of relying on the evidence in the record.  These arguments are addressed below.

1.      The ALJ's treatment of claimant's medical sources

Claimant argues that the ALJ used improper standards in evaluating the opinions of her medical professionals, in particular, Dr. Fredrickson's report, which was essentially rejected by

the ALJ.  (Pl.'s Brief at 5); Tr.  29.  The ALJ reasoned that the entire record did not sustain Dr.

Fredrickson's diagnosis and assignment of GAF, and that he relied on the statements of other

mental health practitioners and did not use any means of corroboration, such as the

administration of standardized testing.  Tr. 19.  Claimant questions why the ALJ rejected Dr.

Fredrickson's opinion and accepted the opinions of Drs. Hennings and Lahman, when neither

opinion was based on "standardized psychological testing."  (Pl.'s Brief at 6).

    The ALJ has discretion to reject the opinion of any medical source if it is unsupported by

the record as a whole or premised on the claimant's properly discredited subjective allegations.

Baston v. Comm'r of Soc. Sec., 427 F.3d 1190, 1216-17 (9th Cir. 2004).  The opinion of a

treating physician is generally given the greatest weight because "he is employed to cure and has

a greater opportunity to know and observe the patient as an individual."  Sprague v. Bowen, 812

F.2d 1226, 1230 (9th Cir. 1987).  The opinion of the treating physician alone, however, does not

necessarily determine either the physical condition or the ultimate issue of disability.  *See*

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); Rodriguez v. Bowen, 876 F.2d 759,

761-62 (9th Cir. 1989).  The ALJ may reject a treating physician's opinion if the ALJ gives

"specific, legitimate reasons for doing so that are based on substantial evidence in the record."

Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995); Magallanes, 881 F.2d at 751, 755.

Opinions of a nonexamining medical source may serve as substantial evidence when they are

supported by other evidence in the record and are consistent with it.  Andrews, 53 F.3d at 1041.

Where medical reports are inconclusive or contradictory, questions of credibility and resolution

of conflicts in the evidence are functions solely of the Commissioner.  Morgan v. Commissioner

of the SSA, 169 F.3d 595, 599 (9th Cir. 1999).

The ALJ properly rejected Dr. Fredrickson's report for three reasons.  First, the lack of any record of a direct examination conducted by Dr. Fredrickson allowed the ALJ to conclude that Dr. Fredrickson based his report and diagnosis on the reports filed by the nurses employed by Marion County Adult Mental Health.  Dr. Fredrickson never stated that he personally examined claimant; he simply filled out a form labeled "mental status report."  In the blank next to "Date first examined," he wrote in "1-23-02," and next to "Frequency of visits," he filled in "once a month."  Nowhere does Dr. Fredrickson state that he was in direct contact with claimant.  Therefore, as a nonexamining physician, Dr. Fredrickson's opinion is only entitled to the same weight as that of Drs. Hennings and Lahman, and the ALJ's duty is to resolve any conflicts between these nonexamining sources and determine which is more consistent with other evidence in the record.  *See* 20 C.F.R. §§ 404.1527, 416.919.

Second, Dr. Fredrickson's diagnoses was based on nurses' progress notes.  Nurses are not acceptable medical sources.  SSR 06-3p.  Their opinions and reports may (and should) be used as evidence of the severity or extent of the claimant's alleged disability, but not to establish a diagnosis.  Id.  Dr. Fredrickson's diagnoses restate verbatim those given by Newman, which may not be relied on to establish an impairment.  Tr. 226.

Third, the reports Dr. Fredrickson relied on in his assessment were based on claimant's allegations of symptoms and not on any actual testing.  Obviously, neither Dr. Fredrickson's report nor the opinions of Drs. Hennings and Lahman were based on actual testing, as claimant never underwent standardized psychological testing during the relevant period.  Claimant argues that if neither Dr. Fredrickson's report nor the opinions furnished by Drs. Hennings and Lahman was based on standardized psychological testing, the ALJ's decision to choose one over the other

16 - OPINION AND ORDER

must necessarily be arbitrary and/or biased.  (Pl.'s Brief at 6).  Claimant, however, fails to acknowledge that while Dr. Fredrickson's report (made on December 26, 2002) was based on the limited data contained in claimant's file at Marion County Adult Mental Health, the opinions of Drs. Hennings and Lahman (given on January 17 and April 11, 2003) were based on the record as a whole and not limited to the information compiled by a single facility.  The ALJ did not "ignore" Dr. Fredrickson's opinion, indeed, he spent almost two pages of his opinion analyzing Dr. Fredrickson's sparse and conclusory report.  Tr. 19.  Therefore, a different standard was not used to analyze claimant's physician and the ALJ was within his discretion in analyzing and resolving the conflicting evidence presented by the nonexamining medical sources.

Claimant next contends that proper weight was not accorded to her medical professionals.  (Pl.'s Brief at 7-8).  According to SSR 06-3p, only "acceptable medical sources" can provide evidence to establish (diagnose) an impairment.  Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech language pathologists.  SSR 06-3p.  The opinions of certain medical professionals who are not acceptable medical sources, including nurse practitioners, physician assistants, licensed social workers, therapists, etc., must nonetheless be taken into consideration by the ALJ and may serve to establish the severity of the impairment and how it affects the claimant's functional capacity.  Id.

Claimant asserts that the opinion of a non-acceptable medical source may outweigh the opinion of an acceptable medical source, including that of a treating or examining source.  (Pl.'s Brief at 9).  This may be true in some cases, but only to the extent that the opinion of the non-acceptable medical source serves to establish the severity and functional effect of the

17 - OPINION AND ORDER

impairment.  SSR 06-3p.  Under no circumstances should a non-acceptable medical source's

diagnosis be used to override that of an acceptable medical source.  Id.  Thus, the ALJ was

entitled to reject Newman's diagnosis of Major Depressive Disorder with Psychotic Features,

Post-Traumatic Stress Disorder (chronic), and Polysubstance Dependence (alcohol,

methamphetamines, marijuana, nicotine, and caffeine), and accept Dr. Brown's diagnosis of

"Depression with some delusional thinking."

    Claimant asserts that the ALJ erred by rejecting the medical opinion of claimant's treating

medical professionals (Newman and Nichols) and consulting physician (Dr. Brown).  (Pl.'s Brief

at 10).  The weight given to opinions of non-acceptable medical sources depends on the

particular facts of the case, the source of the opinion, including that source's qualifications, the

issue(s) that the opinion is about, and/or other considerations.  SSR 06-3p.  Other considerations

include the degree to which the source presents relevant evidence to support the opinion, how

consistent the opinion is with the rest of the evidence, the extent of the source's relationship with

the claimant, and any other factors which tend to support or refute an opinion.  Id.  Only

acceptable medical sources can be considered "treating" sources, as defined in 20 CFR 404.1502

and 416.902, whose medical opinions may be entitled to controlling weight.  SSR 03-2p.

    Although Nichols regularly saw claimant for a period of over a year, the diagnoses given

and treatment provided were based on the diagnoses given by Newman during the initial

assessment and the allegations of symptoms given by claimant.  No standardized psychological

testing was used to corroborate the results Newman's evaluation; it was based for the most part

on claimant's allegations.  The ALJ properly determined that claimant lacked credibility, as

discussed below, and it follows that opinions from non-acceptable medical sources based on

18 - OPINION AND ORDER

claimant's allegations of symptoms and generally unsupported by objective methodology (indeed

often contrasting with objective laboratory and clinical findings[1]) should be given little weight.

Nichols' progress notes are riddled with contradictions, leading the ALJ to accord them

little weight.  On all but two occasions, Nichols states in the progress notes that claimant is doing

"well," "okay," "fine," and/or "status quo," and that "[p]atient is generally psychiatrically

stable."  Tr. 200-03, 207, 327, 330, 336.  In stark contrast to these notes, Nichols repeatedly

assigns claimant a Global Assessment of Functioning ("GAF") of 25, leaving Newman's initial

impression unchanged.  Id.  The GAF scale, which does not take into account limitations posed

by physical impairments, measures a patient's psychological and social functioning from 1 to

100, 100 being best.  12-101 Attorneys' Textbook of Medicine (3d ed. 2007) ¶ 101.20.  A GAF

score of 21-30 indicates that patient's behavior is considerably influenced by delusions or

hallucinations, or serious impairment of communication or judgment (e.g., sometimes

incoherent, acts grossly inappropriately, suicidal preoccupation), or complete inability to

function in almost all areas.  American Psychiatric Association, Diagnostic and Statistical

Manual of Mental Disorders, 202 (4th ed. 1995).  Claimant reported hearing "voices in the

background" on a few occasions, but did not desire to have a medication change because of it;

thus her behavior can hardly be called "considerably influenced by delusions or hallucinations."

E.g. Tr. 201.  Her communication has never been noted to be impaired in these status reports,

and Nichols likewise did not mention claimant having problems with judgment.  Furthermore,

Nichols remarked in her notes on February 20, 2002 that claimant is not addicted to drugs, yet

---

[1]I.e., claimant's allegations of knee pain/negative right knee MRI; claimant's allegations
of back pain/negative back x-ray; claimant's allegations of rheumatoid arthritis/no evidence of
crepitous or musculoskeletal deformities.

under "diagnosis," Nichols wrote "polysubstance dependence." Tr. 208. These visits appear to have been nothing more than short conversations between Nichols and the claimant, lacking any kind of psychological testing except for the standard AIMS test to look for signs of tardive dyskensia. Therefore, the ALJ was within his discretion to consider factors such as the ones discussed above in his determination of how much weight to accord to claimant's medical sources under SSR 06-3p.

Claimant next asserts that the ALJ erred because he relied on Drs. Lahman's and Hennings' opinions in forming claimant's RFC. (Pl.'s Brief at 6-7). Although the ALJ relied on the opinions of Drs. Hennings and Lahman, their opinions were corroborated by the opinion of Dr. Brown, an examining psychologist. In Dr. Brown's report, he notes that claimant has "good insight," "high reliability," is "cohesive and organized," "cooperative," has "no tangentialness," and good concentration. Tr. 222-23. Dr. Brown states that claimant's prognosis is good and her symptoms of depression are improving. Tr. 223. Contrastingly, Dr. Fredrickson states in his report that claimant has "marked" deficiencies in concentration, persistence and pace, is tangential at times, and is unable to adapt. Tr. 222, 227. Dr. Fredrickson also notes that there has been no change in condition; that her depression is chronic, severe, and persistent. Tr. 226. In view of the conflicting opinions, the ALJ was entitled to accept the opinions of two nonexamining psychologists as corroborated by an examining psychologist over an opinion of a nonexamining physician in conflict with that of an examining psychologist. The ALJ did not, as claimant alleges, reject the opinion of either an examining or treating physician. The opinion he rejected was that of a nonexamining physician, and it was unsupported by the record as a whole and by the opinions of an examining psychologist, examining physicians, and treating nurses.

The ALJ also rejected the opinion of Dr. Brown to the extent that Dr. Brown purported to opine about claimant's physical limitations, because as a psychologist, Dr. Brown's field of expertise limits him to opinions regarding psychological conditions. Therefore, the ALJ's findings regarding claimant's RFC were based on substantial evidence.

2.    The ALJ's alleged initiation of medical opinion

Claimant asserts that the ALJ offered his own medical opinion in place of that of a medical professional in three instances in his opinion. (Pl.'s Brief at 10-12). Specifically, claimant points to the ALJ's statement that the nurse practitioner at Marion County Adult Mental Health should have employed standardized psychological testing in making her assessments; his statement that "[a] positive on Waddell's test has been generally recognized as meaning that in fact the claimant was responding to a task that would not show any valid findings of an impairment," and his references to the need for "objective" findings to demonstrate or establish an impairment. Id.

What claimant does not recognize is that rather than injecting his own medical opinions with the analysis, the ALJ was merely explaining the lack of evidence to support claimant's allegations of disability. Eligibility for benefits may not be based solely on subjective allegations; there must be objective medical evidence of an underlying condition and its severity. 20 CFR § 423(d)(5)(a). Where a claimant's credibility has been properly discounted by the ALJ, claimant's subjective reports are of little use in establishing the existence of a severe impairment. Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002). The ALJ must provide clear and convincing reasons for rejecting the claimant's pain or symptom testimony unless there is affirmative evidence of malingering. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). In

determining whether a claimant's testimony regarding the severity of symptoms is credible, the ALJ may consider: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." Smolen v. Chater, 80 F.3d 1276, 1284 (9th Cir. 1996).

The record contains substantial evidence of claimant's lack of credibility. Among other things, the ALJ considered the following evidence in determining claimant's credibility. Dr. Box noted in his report that based on claimant's allegations of pain and physical limitation, it would have made it impossible for her to ambulate into the examining room the way she did, or sit and get up from the examining table the way she did. Tr. 214-15. Dr. Box also noted that claimant had "severe somatization and possible attempt at secondary gain." Tr. 216. During an emergency room visit for *right* arm pain on October 23, 2001, the treating nurse stated in her report that "[i]t should be noted that [claimant] had no apparent difficulty raising R arm over head while speaking outside of shoulder exam context but had difficulty raising arm above horizontal with shoulder during shoulder range of motion exam." Tr. 190. Yet on her Reconsideration Disability Report, claimant stated that she had *left* arm pain and weakness. Tr. 124. Dr. Buck's progress notes for October 30, 2002 state that claimant told him she was a nonsmoker, yet he could smell cigarettes on her breath. Tr. 338. When he confronted her, claimant admitted that she still smoked. Id. Claimant stated on April 4 and October 6, 2003 to medical practitioners that she babysat her two granddaughters, aged 2 and 4 years, eight hours a day. Tr. 326, 330. However, at the hearing on January 5, 2004, she testified that she only babysat one child, two or three times a week, for four

hours at a time, for the last four months.  Tr. 396.  Soon after, she stated that she took "the kids"

to the pool to go swimming, then corrected herself and said "[m]y granddaughter."  Tr. 397.

These and other inconsistencies in claimant's statements led the ALJ to find claimant not fully

credible; it follows that any medical opinion based on her own reports may likewise be

discounted.

     I conclude that the ALJ provided sufficient reasons to support his credibility

determination.  Thus, he correctly noted that objective testing of claimant was not performed, that

medical opinions largely were based on her subjective complaints.  The ALJ was entitled to

discount or reject those medical opinions for lack of support from objective psychological testing.

*See* Morgan v. Commissioner of the SSA, 169 F.3d 595, 600 (9th Cir. 1999).

     With respect to the ALJ's statement concerning Waddell's signs, on May 6, 2002, a

treating nurse practitioner at Willamette Family Medical Center noted that during an examination

for back pain, claimant displayed two positive Waddell's signs.  Tr. 175.  The ALJ points to this

fact in his opinion as evidence of claimant's lack of credibility because the Waddell's test is a

recognized method of establishing five signs of non-organic sources of lower back pain.  Wick v.

Barnhart, 173 Fed. Appx. 597, 598 (9th Cir. 2006); s*ee* Gordon Waddell et al., Nonorganic

Physical Signs in Low-Back Pain, 5 Spine 117, 117-25 (Mar.-Apr. 1980).  A positive on three out

of five of the signs is a clinically significant indicator of non-organic pain, somatization, or

malingering.  5 Attorneys' Textbook of Medicine ¶ 15.83 (3d ed. 2000).  A positive result on the

Waddell's test may be taken into consideration by the ALJ, but may not alone constitute

affirmative evidence of malingering.  Wick, 173 Fed. Appx. at 598.  The ALJ did not use the

positive result as a stand-alone indicator of malingering; instead, he considered it together with

the other evidence in assessing claimant's credibility.  Thus, the ALJ's mention of the Waddell's

test results did not constitute "playing doctor," and the ALJ's mischaracterization of the

Waddell's test as a method to weed out false reports, if error, was harmless.

The last instance in which claimant alleges the ALJ was "playing doctor" are his

references to the necessity of "objective findings" to establish claimant's disability.  (Pl.'s

Brief at 12-13).  Claimant argues in her brief that she "* * * is not required to demonstrate her

medical problems by 'objective findings.'"  (Pl.'s Brief at 11-12).  Claimant contends that the ALJ

misunderstood the text of the CFR, and confused the terms "signs" with "objective findings,"

which, according to claimant, are substantially different. (Pl.'s Brief at 12).  To establish the

existence of a medically determinable impairment(s) of the required duration, there must be

medical evidence consisting of "symptoms, signs, and laboratory findings."  20 C.F.R. part 404,

subpt. P, app. 1, 12.00B; § 416.908.

"Signs" are "medically demonstrable phenomena that indicate specific psychological

abnormalities * * * which indicate specific abnormalities of behavior, affect, thought, memory,

orientation or contact with reality."  20 C.F.R. part 404, subpt. P, app. 1, 12.00B; § 416.908.  It

appears that the ALJ was using "objective findings" to mean "laboratory findings," or even

"medically demonstrable phenomena."  Although in the context of mental impairments,

laboratory findings likely may be in the form of examining or treating psychologists' or

psychiatrists' clinical findings, symptoms alone are insufficient to establish an impairment.  42

U.S.C. § 423(d).  "Signs" likewise do not alone establish a medically determinable severe

impairment; they must in turn be accompanied by symptoms and laboratory findings.  20 C.F.R.

part 404, subpt. P, app. 1, 12.00B; § 416.908.

24 - OPINION AND ORDER

I conclude that the ALJ did not improperly "play doctor."  Instead, he properly assessed the medical evidence on the record and resolved conflicting medical opinions; nor did he err in assessing claimant's credibility.

CONCLUSION

Based on a review of the record, the Commissioner's decision denying claimant DIB and SSI benefits is supported by substantial evidence on the record as a whole, is free from error, and is therefore AFFIRMED.

DATED this 13th day of July, 2007.


 /s/ Robert E. Jones
ROBERT E. JONES
U.S. District Judge

25 - OPINION AND ORDER